USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/28/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JASON HOSKINS, on behalf of himself and others similarly situated,

Plaintiff,

-against-

THE CITY OF NEW YORK, et al.,

Defendants.

23-CV-02958 (MMG)

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

Plaintiff Jason Hoskins brings this action against Defendants City of New York (the "City"), Dr. Patricia Yang, and Dr. Ross MacDonald arising from medical treatment he received while detained at Rikers Island during the early months of the COVID-19 pandemic. Plaintiff alleges that Defendants violated the Fourteenth Amendment by acting with deliberate indifference to his opioid use disorder and withdrawal symptoms after the City's Correctional Health Services temporarily suspended new admissions to its opioid-maintenance program. Defendants move for summary judgment. For the reasons set forth below, the motion is GRANTED.

## BACKGROUND

## I. RELEVANT FACTS[1]

### A. Correctional Health Services and KEEP

Correctional Health Services ("CHS") provides medical services to individuals detained in New York City jails. As relevant here, CHS operates the Key Extended Entry Program

[1] The Court primarily sources facts from Defendants' Rule 56.1 Statement of Undisputed Material Facts, *see* Dkt. No. 47 ("Defs. 56.1"), and the exhibits appended to the Declaration of Thomas Lindeman, *see* Dkt. No. 46 ("Lindeman Decl."). Where a fact stated in Defendants' Rule 56.1 Statement

("KEEP"), a jail-based opioid treatment program that provides methadone or buprenorphine maintenance to qualifying individuals with opioid use disorder ("OUD") and seeks to connect those individuals with community treatment upon release. Defs. 56.1 ¶ 1.

OUD is a chronic medical condition characterized by, among other things, escalating opioid use, loss of control over opioid use, and withdrawal symptoms following abrupt discontinuation. Ex. E at 1. Incarceration and forced opioid withdrawal are associated with an increased risk of overdose death following release, while exposure to methadone or buprenorphine maintenance therapy during incarceration can substantially reduce post-release mortality. *Id.*

Individuals entering City custody undergo a medical intake that includes a substance-use history and urine drug screening. *Id.* at 3. If a patient reports opioid use or tests positive for

---

is supported by evidence and controverted only by a conclusory statement by Plaintiff, the Court finds that fact to be true. *See* Local Civ. R. 56.1(c) ("Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."). Citations to Defendants' Rule 56.1 Statement incorporate by reference the documents cited therein.

Plaintiff's Response to Defendants' Rule 56.1 Statement, Dkt. No. 52 ("Pl. 56.1 Resp."), does not comply with Local Civil Rule 56.1 in several respects. Although Plaintiff purports to dispute several of Defendants' factual assertions, many of those responses do not cite evidence in the record supporting the asserted dispute. *See* Local Civ. R. 56.1(d) ("Each statement by the movant or opponent . . . controverting any statement of material fact must be followed by citation to evidence which would be admissible."). Plaintiff's submission also contains a number of additional factual assertions that lack a record citation or cite the record only generally. *See, e.g.*, Pl. 56.1 Resp. ¶¶ 14.P, 22.P, 26.P, 57.P, 59.P. The Court has nevertheless independently reviewed the cited record and, where appropriate, considers evidence properly before it notwithstanding Plaintiff's failure to comply strictly with Local Civil Rule 56.1. *See Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("[I]n determining whether the moving party has met [its] burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.").

The Court refers to the memoranda of law in support of and in opposition to Defendants' motion for summary judgment as follows: Dkt. No. 45 ("Mot."), Dkt. No. 50 ("Opp."), Dkt. No. 53 ("Reply"). The Court refers to the exhibits appended to the Lindeman Declaration as they are marked and referenced therein, *e.g.*, Dkt. No. 46-1 is referred to as "Ex. A."

opioids, medical staff complete an assessment designed to determine whether the patient is physically dependent on opioids and whether the patient may have a substance-use disorder requiring continued treatment. *Id.* To be enrolled in KEEP, a patient must have a moderate to severe OUD for at least a year and voluntarily engage with treatment. Defs. 56.1 ¶ 2. A patient must also either enter the jail system on verified community methadone maintenance or receive withdrawal management with a six-day tapering dose of methadone before being evaluated for further treatment. *Id.* ¶ 3.

**B. The March 2020 Suspension of New KEEP Admissions**

In March 2020, the COVID-19 pandemic reached New York City and presented significant public health challenges to the City's jail system. *Id.* ¶¶ 4–7. On March 18, 2020, CHS suspended new initiations of methadone and buprenorphine maintenance treatment through KEEP, while continuing withdrawal management for patients reporting opioid use or testing positive for opiates. *See* Ex. F ("[I]f a patient has a positive UDS for opiates or reports opiate use, you can place them on a 6 day methadone taper[.]"). Individuals already receiving verified community methadone or buprenorphine treatment at time of entry were also to continue receiving that treatment. *Id.*

**C. Plaintiff's Detention and Medical Treatment**

Plaintiff entered the Anna M. Kross Center ("AMKC") at Rikers Island on March 25, 2020. Defs. 56.1 ¶ 8. During his medical intake the following day, Plaintiff reported a history of opioid use. *Id.* ¶¶ 9–10. His intake assessment documented heroin use and identified several withdrawal symptoms, including yawning, bone and muscle pain, nausea, vomiting or diarrhea, and insomnia. Ex. A at D000287. The assessment also listed a treatment plan of "6 Day Methadone Taper + KEEP Referral." *Id.* A medication record separately reflects that Plaintiff

received 20 milligrams of methadone on March 26. *Id.* at D000279 ("Pt medicated as per order, tolerated well.").

A KEEP referral was generated for Plaintiff on April 1 but denied on April 3. Defs. 56.1 ¶¶ 13–14. On April 15, a Bronx Defenders social worker contacted CHS, reporting that Plaintiff was experiencing withdrawal symptoms. Dkt. No. 50-4. Plaintiff was evaluated that day after complaining of body pain associated with opioid withdrawal. Ex. A at D000217–18. Medical staff prescribed ibuprofen and instructed Plaintiff to seek follow-up care if his symptoms worsened. Defs. 56.1 ¶ 15; Ex. A at D000218.

Plaintiff was again referred to KEEP on April 17 and enrolled in KEEP on April 20. Defs. 56.1 ¶¶ 16–17. He thereafter received methadone maintenance treatment, and his dosage was subsequently increased at his request. *Id.* ¶ 18. On May 22, 2020, Plaintiff was discharged from AMKC, prescribed continuing methadone treatment, and referred to a community service provider. *Id.* ¶¶ 19–20.

## II. PROCEDURAL HISTORY

Plaintiff filed this action on April 7, 2023, against the City, Dr. Patricia Yang in her individual capacity as Senior Vice President of CHS, and Dr. Ross MacDonald in his individual capacity as Chief Medical Officer of CHS. Dkt. No. 1.

Following discovery, Defendants moved for summary judgment. Dkt. No. 44. Plaintiff opposed the motion, and it is now fully briefed and before the Court for decision. Dkt. Nos. 50, 53..[2]

[2] In his opposition brief, Plaintiff voluntarily withdrew his individual claim under the Americans with Disabilities Act ("ADA"). Opp. at 1. That claim is therefore dismissed. Plaintiff nevertheless asserts that the ADA claim "would apply to class members who were successfully enrolled in a treatment program and had ceased using drugs." *Id.* But no class has been certified, and Plaintiff may not continue to litigate claims belonging only to putative class members after withdrawing his own ADA claim.

## DISCUSSION

## I. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)..[3] "The court's role with respect to . . . a motion [for summary judgment] is not to resolve disputed questions of fact but solely to determine whether, as to any material fact, there is a genuine issue to be tried." *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024). "In determining whether genuine issues of fact exist, the district court may not properly consider the record in piecemeal fashion," and must "review the record taken as a whole," drawing all reasonable inferences in favor of the non-movant. *Id*.

If the moving party demonstrates the absence of a genuine dispute as to all material facts, the non-movant must point to evidence that would be sufficient to support a jury verdict in his favor. *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002). If, based on the record before the Court, a claim has arguable merit, then summary judgment cannot be granted. *Moll*, 94 F.4th at 228; *Am. Home Assurance Co. v. Hapag Llyod Container Line, GmbH*, 446 F. 3d 313, 315 (2d Cir. 2006) ("If there is any evidence in the record that could

---

Accordingly, no ADA claim remains before the Court. *See Hughes v. Nat'l Football League*, No. 22-CV-10743 (JLR), 2024 WL 4063740, at *6 (S.D.N.Y. Sept. 5, 2024).

[3] Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and omissions, and adopt alterations.

reasonably support a jury's verdict for the non-moving party, summary judgment must be denied."). However, a non-movant's "reliance upon conclusory statements or mere allegations will not suffice to defeat summary judgment." *Moll*, 94 F.4th at 228. Summary judgment is proper where the non-movant "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id*.

**B. Deliberate Indifference to Serious Medical Needs**

Because Plaintiff was a pretrial detainee during the relevant period, his claim for deliberate indifference to his medical needs arises under the Due Process Clause of the Fourteenth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). To establish such a claim, Plaintiff must satisfy two requirements: an objective requirement concerning the challenged deprivation of medical care, and a *mens rea* requirement concerning Defendants' state of mind. *See id.*; *Smith v. Outlaw*, No. 15-CV-09961, 2017 WL 4417699, at *2 (S.D.N.Y. Sept. 30, 2017).

The first requirement involves two inquiries. First, the Court must determine "whether the prisoner was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). The Constitution requires officials to provide "reasonable care"; accordingly, "prison officials who act reasonably cannot be found liable" under the deliberate-indifference standard. *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 845 (1994)). Second, if the plaintiff was deprived of adequate care, the Court must determine whether the inadequacy was "sufficiently serious." *Id.* at 280.

As to *mens rea*, a plaintiff must establish that the defendant "acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed," even though the defendant "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35. The plaintiff

therefore need not establish that the defendant actually knew that his conduct posed an excessive risk. *Id.* But deliberate indifference nevertheless "requires proof of a *mens rea* greater than mere negligence." *Id.* at 36. Thus, an inadvertent failure to provide adequate medical care, or even conduct amounting to medical malpractice, does not by itself establish a constitutional violation. *See Charles v. Orange Cnty.*, 925 F.3d 73, 87 (2d Cir. 2019).

## II. DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S DELIBERATE INDIFFERENCE CLAIM

Defendants argue that summary judgment is warranted because the record establishes that Plaintiff received treatment for his opioid withdrawal and, in any event, no reasonable jury could conclude that Defendants acted with the requisite *mens rea*. *See* Mot. at 7–8. Plaintiff responds that genuine disputes of material fact exist concerning whether he received the prescribed six-day methadone taper and whether Defendants knowingly adopted a policy that deprived individuals with OUD, including Plaintiff, of medically necessary treatment. *See* Opp. at 11–12.

The parties devote substantial attention to whether Plaintiff actually received the six-day methadone taper prescribed at intake. The record establishes that on March 26, 2020, Plaintiff was prescribed a six-day taper and received at least one 20-milligram dose of methadone. *See* Ex. A at D000279, D000286–87. Plaintiff, however, contends that he did not receive the remainder of the taper and points to his testimony, the absence of corresponding administration records, and evidence that he continued to report withdrawal symptoms during the ensuing weeks. Opp. at 22–23; *see also* Ex. G ("Hoskins Tr.") at 40:20–42:1. In particular, Plaintiff relies on an April 15, 2020 communication from a Bronx Defenders social worker reporting that Plaintiff was experiencing withdrawal symptoms and requesting medical assistance. Dkt. No. 50-4. Plaintiff's medical records likewise reflect that he was evaluated that day for body pain associated with opioid withdrawal. Ex. A at D000217–18. Plaintiff therefore has offered

evidence beyond his testimony that could support his contention that his withdrawal symptoms persisted after intake.

But even assuming Plaintiff did not receive the remainder of the prescribed taper and that the resulting deprivation was sufficiently serious to satisfy the first prong of the deliberate-indifference standard, Plaintiff's claim fails because the record does not permit a reasonable jury to find that Dr. Yang or Dr. MacDonald acted intentionally or recklessly with respect to that deprivation.

**A. Claims Against Dr. Yang and Dr. MacDonald**

Plaintiff's theory of liability against Dr. Yang and Dr. MacDonald rests principally on their involvement in CHS's March 18, 2020 decision suspending new initiations of methadone and buprenorphine maintenance treatment through KEEP. *See* Opp. at 15–16. According to Plaintiff, Defendants knew that opioid withdrawal presents serious medical risks but nevertheless participated in a policy change that foreseeably caused Plaintiff and similarly situated detainees to undergo forced withdrawal without appropriate treatment.[4] *Id.*

The record does not support that characterization of the March 18 policy. The directive suspended new methadone and buprenorphine *maintenance program* initiations because, among other concerns, CHS lacked certainty that patients released from custody would be able to connect with community methadone programs and buprenorphine providers given the closure of many facilities and programs during the early lockdown phase of the COVID-19 pandemic in New York City, and daily interactions of detainees and medical staff increased the risk of COVID-19 transmission. *See* Ex. F (suspending initiations "[i]n light of the current COVID-19

[4] There is no allegation that Dr. Yang or Dr. McDonald knew, or should have known, of the particulars of Plaintiff's provision of immediate withdrawal treatment and whether he did, or did not, receive the prescribed dose of methadone tapering.

pandemic" due to "the lack of certainty that patients will be able to connect to community methadone programs and buprenorphine providers, plus the risk of patients getting daily DOT in the jails"). Plaintiff disputes Defendants' characterization of the decision as a measure designed to reduce COVID-19 transmission and argues that the "rationale for the decision was arbitrary and capricious," Opp. at 16, but offers no citation to the record in support of these contentions.

Moreover, the directive did not suspend treatment for opioid withdrawal. To the contrary, it specifically instructed that patients reporting opioid use could be placed on a "6 day methadone taper." *See* Ex. F. Dr. MacDonald similarly testified that the temporary suspension did not change CHS's withdrawal-management practices. Ex. I at 22:6–7 (clarifying that "the treatment of acute withdrawal was not affected by the suspension"); *id.* at 34:24–35:1 ("[T]he treatment of withdrawal from opioids is a short-term clinical intervention separate from maintenance therapy."). Thus, the record distinguishes between the initiation of ongoing methadone or buprenorphine maintenance treatment—the service that was temporarily suspended—and treatment intended to manage acute withdrawal, which remained available.

That distinction is significant. While Plaintiff emphasizes that CHS understood the serious health risks associated with forced opioid withdrawal, knowledge that untreated opioid withdrawal presents serious risks is irrelevant to deliberate indifference where the policy challenged by Plaintiff expressly preserved treatment intended to address those risks. *See* Ex. F; Ex. I at 40:1–12. Indeed, the directive's continued provision for opioid withdrawal treatment through a six-day methadone taper cannot be reconciled with the assertion that Dr. Yang or Dr. MacDonald intentionally or recklessly disregarded the consequences of forced withdrawal.

Plaintiff separately disputes Defendants' contention that the temporary suspension of maintenance treatment was intended to limit the spread of COVID-19. He argues that the

contemporaneous directive instead identifies concerns regarding continuity of care upon release and points to deposition testimony indicating that CHS did not face a physician-staffing shortage at the time. *See* Opp. at 17–18. Plaintiff also emphasizes that CHS did not seek a variance from the Board of Correction's minimum health-care standards before implementing the temporary suspension. *See id.* at 15.

But those assertions, even if taken to be true, cannot substitute for the absence of evidence supporting Plaintiff's contention that Defendants acted intentionally or recklessly. Plaintiff has not identified any evidence permitting a reasonable jury to find that Dr. Yang or Dr. MacDonald intentionally deprived him of adequate medical care or recklessly failed to act despite knowing, or having reason to know, that their conduct created an excessive risk to his health. *See Darnell*, 849 F.3d at 35. Plaintiff likewise identifies no record evidence supporting the claim that a temporary decision to suspend methadone and buprenorphine maintenance treatment because of concerns about continuity of treatment upon release can, without more, support the required inference of recklessness where withdrawal-management treatment remained available.

Plaintiff also argues that Dr. Yang and Dr. MacDonald failed to respond appropriately after receiving reports that detainees were undergoing forced withdrawal. *See* Opp. at 15, 20–21. The evidence Plaintiff cites includes communications from legal-services providers raising broader concerns regarding the implementation of KEEP and treatment of individuals with OUD during the early months of the pandemic. *See* Opp. at 8; Dkt. No. 50-9 at D000093. Those communications may have put CHS leadership on notice that problems were being reported with the implementation of opioid-treatment services. But Plaintiff "must show, for each defendant, that the defendant acted with deliberate indifference to [his] medical needs." *Brock v. Wright*,

315 F.3d 158, 162 (2d Cir. 2003). The record does not establish that either Dr. Yang or Dr. MacDonald personally knew, or should have known, that Hoskins had failed to receive his prescribed taper, participated in the April 3 decision denying his initial KEEP referral, or otherwise directed the medical treatment provided to him. Moreover, the communication cited by Plaintiff is dated May 5, 2020, and it is undisputed that, as of April 20, 2020, Plaintiff was enrolled in methadone maintenance treatment through KEEP..[5]

At best, the evidence could permit a finding by a jury that personnel responsible for Plaintiff's day-to-day treatment failed to administer all of the withdrawal treatment prescribed to him or failed to adequately respond to his continuing symptoms. But negligence or even medical malpractice by those personnel would not establish deliberate indifference by Dr. Yang or Dr. MacDonald. *See Brock*, 315 F.3d at 162. Plaintiff has not identified evidence connecting either individual Defendant to the alleged failure to implement the withdrawal-management treatment contemplated by CHS policy in his particular case.

Accordingly, even drawing all reasonable inferences in Plaintiff's favor and assuming that he did not receive the full six-day methadone taper prescribed at intake, no reasonable jury could conclude that Dr. Yang or Dr. MacDonald intentionally deprived him of adequate medical treatment or recklessly failed to act with reasonable care despite knowing, or having reason to know, that their conduct posed an excessive risk to his health. Dr. Yang and Dr. MacDonald are therefore entitled to summary judgment..[6]

[5] There is no evidence that Dr. Yang or Dr. MacDonald were aware, or should have been aware, of the earlier April 15, 2020 email from a social worker at Bronx Defenders about Plaintiff's opioid withdrawal symptoms.

[6] Because Plaintiff has failed to establish a Fourteenth Amendment claim against Yang and MacDonald, the Court need not reach the individual Defendants' argument that they are entitled to qualified immunity. *See* Mot. at 10–11.

**B. Claim Against the City of New York**

As Plaintiff has failed to establish an underlying constitutional injury, his claim against the City under Section 1983 fails as a matter of law. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."). Accordingly, the City is also entitled to summary judgment.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED in full. The Clerk of Court is respectfully directed to enter judgment for Defendants and CLOSE this case..[7]

Dated: September 28, 2026
New York, New York

SO ORDERED.

MARGARET M. GARNETT
United States District Judge

[7] As noted above, *see supra* n.2, because no class has been certified and because all of Plaintiff's claims are dismissed, either voluntarily or on summary judgment, that dismissal disposes of the entire case, as there is no one to assert any claims on behalf of a putative class.